**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION** |
| **v.** | **NO.  23-088** |
| **DEMETRIUS JENKINS** | |
| *Register# 46398-510* | |

## OPINION

Defendant Demetrius Jenkins was indicted for a violation of 18 U.S.C. § 922(g)(1), which makes it unlawful for someone "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  Jenkins has filed a Motion to Dismiss the Indictment, arguing that Section 922(g)(1) is unconstitutional both facially and as applied to him under the Second Amendment, void for vagueness under the Due Process Clause of the Fifth Amendment, and beyond Congress's authority under the Commerce Clause.[1]  For the reasons that follow, the Motion will be denied.

### I.       Background

The Indictment is straightforward.  It alleges that Jenkins,

> knowing he had previously been convicted in a court of the Commonwealth of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, that is, a Rock Island Armory, model 206 revolver, caliber 38 Special, bearing serial number RIA2271834, loaded with six live rounds of 38 Special ammunition, and the firearm was in and affecting interstate and foreign commerce[,] [i]n violation of Title 18, United States Code, Section

---

[1] While Jenkins submits that "the Supreme Court could one day 'temper' its" Commerce Clause jurisprudence and thus argues "for preservation purposes" that Section 922(g)(1) is unconstitutional under the original public meaning of that provision, he acknowledges that this argument is foreclosed by Supreme Court precedent.  *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-38 (1937); *Wickard v. Filburn*, 317 U.S. 111, 124-25 (1942).

922(g)(1).

The Criminal Complaint preceding the Indictment includes an affidavit averring that two Philadelphia Police Department officers who were familiar with Jenkins's appearance saw him crossing the street on the night of November 23, 2022.  The officers say they knew that Jenkins had an outstanding arrest warrant for robbery, so they detained him.  When they frisked him, the officers found the revolver in his jacket pocket and also discovered over a dozen containers of suspected methamphetamine.

The legal framework for evaluating the constitutionality of a Section 922(g)(1) charge is not straightforward.  In July 2023, the Third Circuit, applying the Supreme Court's recent opinion in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), held that Section 922(g)(1) was unconstitutional as applied to a man named Bryan Range, who sought to buy guns decades after his conviction for lying on a food-stamps application.  *Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc).  In light of *Bruen* and *Range*, Jenkins now argues that his Indictment is no longer viable.

In *Bruen*, the Supreme Court held unconstitutional a New York law that required people applying for a permit to carry a concealed firearm outside the home to show "proper cause"— *i.e.*, "a special need for self-protection distinguishable from that of the general community." 142 S. Ct. at 2123 (quotation omitted).  In doing so, *Bruen* also announced a new method for adjudicating Second Amendment controversies.  In brief: Courts may no longer apply the traditional means-ends heightened-scrutiny analysis common to infringements on many constitutional rights.  Instead, the Court instructed, whenever conduct protected by the Second Amendment is burdened, courts are to proceed by analogy and compare historical firearms regulations to the challenged ones.  Only if the government can proffer enough older regulations

sufficiently similar to the challenged laws may they pass constitutional muster.

District courts around the country have tried mightily to apply *Bruen*'s new test, with widely disparate results. *Range* offers some guidance for courts in the Third Circuit. Neither decision, though, supplies clear methods, standards, or metrics by which lower courts should analyze challenges to Section 922(g)(1) indictments under the Second Amendment.

## II.        The Second Amendment

The Second Amendment provides, in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Because the scope of the right that this constitutional provision protects and how courts analyze that right have changed dramatically in recent years, a review of the recent jurisprudence is in order.

### A. *Heller* and *McDonald* Articulate an Individual Right to Self-Defense

Over 200 years after the ratification of the Bill of Rights in 1791, the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) for the first time held that the language of the Second Amendment guaranteed an individual's right to bear arms. In *Heller*, the Court identified the "core" of the Second Amendment right as bearing arms in furtherance of the "lawful purpose of self-defense" in the home. *Id.* at 630. The Second Amendment protects hunting and militia service as well, *id.* at 599, but the central constitutional right at issue is the right to defend oneself. As discussed below, *Heller* does not identify the precise bounds of that right. The Court applied *Heller* to state laws when it incorporated the Second Amendment two years later in *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) (plurality opinion).

The majorities in both *Heller* and *McDonald* took pains to assure lower courts, policymakers, and the public that laws barring people convicted of felonies or felony-equivalents

from possessing firearms were consistent with the Second Amendment.  In *Heller*, the Court cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626 & n.26; *see also McDonald*, 561 U.S. at 786 (plurality opinion).  The Third Circuit subsequently held that "*Heller*'s list of 'presumptively lawful' regulations is not dicta." *United States v. Barton*, 633 F.3d 168, 171 (3d Cir. 2011) (Hardiman, J.), *overruled on other grounds by Binderup v. Att'y Gen.*, 836 F.3d 336, 349 (3d Cir. 2016) (plurality opinion) (en banc).

The courts of appeals generally interpreted *Heller* to require a two-step analysis when evaluating firearms restrictions.  In the Third Circuit, a plaintiff first had to prove "that a presumptively lawful regulation burdens his Second Amendment rights" by "(1) identify[ing] the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member . . . and then (2) present[ing] facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Binderup*, 836 F.3d at 347 (plurality opinion); *United States v. Marzzarella*, 614 F.3d 85, 89-97 (3d Cir. 2010); *see also, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 156 (D.C. Cir. 2019); *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017).  If the plaintiff succeeded, the burden shifted to the government to satisfy intermediate scrutiny—in other words, it then became the government's job to prove that its regulation served an important purpose and was substantially related to its goals.  *Binderup*, 836 F.3d at 353 (plurality opinion) (citation omitted).

### B.  *Bruen* Extends Where the Right Applies and Alters the Test

*Heller* applied only to one's home.  The Supreme Court extended *Heller* beyond the home last year in *Bruen*.  142 S. Ct. at 2135.  But *Bruen* also announced a sea change in how courts must evaluate the constitutionality of restrictions on gun possession—the Court found the

two-step process adopted by *Binderup* and its kindred involved "one step too many." *Id.* at

2127.  It replaced the process with the following: If "the Second Amendment's plain text covers

an individual's conduct," then "the Constitution presumptively protects that conduct." *Id.* at

2126.  Only if the government can "demonstrate that the regulation is consistent with this

Nation's historical tradition of firearm regulation . . . may a court conclude that the individual's

conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation

marks and citation omitted).

The Court offered some guidance on how to determine whether a firearm restriction was

consistent with our nation's history.  Lower courts must engage in "analogical inquiry" by

comparing the historical record that the government offers with the challenged law.  *Id.* at 2133.

"[H]ow and why . . . regulations burden a law-abiding citizen's right to armed self-defense" are

"at least two" ways to determine whether such a law is similar enough to the history that the

government proffers.  *Id.* at 2132-33.  How close a resemblance the challenged law must bear to

the historical record depends on the nature of the policy problem that the law is meant to address.

If the law "addresses a general societal problem that has persisted since the 18th century," the

government must offer "distinctly similar historical regulation[s]."  *Id.* at 2131.  But when faced

with "modern regulations that were unimaginable at the founding," the government need only

produce "relevantly similar" historical firearm restrictions.  *Id.* at 2132.  Thus, cases "implicating

unprecedented societal concerns or dramatic technological changes may require a more nuanced

approach."  *Id.*  In neither context, however, does *Bruen* require a "historical *twin*."[2]  *Id.* at

2133; *see also id.* at 2132 ("[T]he Constitution can, and must, apply to circumstances beyond

_____

[2] The *Bruen* majority also gave some indication as to how much support the government needs to marshal to prove that a historical tradition exists.  The Court "doubt[ed] that *three* colonial regulations could suffice to show a tradition of public-carry regulation."  *Bruen*, 142 S. Ct. at 2142.

those the Founders specifically anticipated.").

As was the case in *Heller* and *McDonald*, the majority and multiple concurrences in *Bruen* emphasized that the Second Amendment self-defense right applied to "law-abiding citizens," 142 S. Ct. at 2133 (directing courts to assess "how and why [at-issue] regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2159 (Alito, J., concurring) ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense . . . ."); *id.* at 2161 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (noting that the at-issue law "den[ied] the right to carry handguns for self-defense to many ordinary, law-abiding citizens" (internal quotation marks and citation omitted)).  Justice Kavanaugh expressly echoed the Court's reassurances in *Heller* and *McDonald* that "longstanding prohibitions on the possession of firearms by felons" remained "presumptively lawful." *Id.* at 2162.  *See also Range*, 69 F.4th at 111 (Ambro, J., concurring) (noting that "three Justices in *Bruen*'s majority opinion reminded us that felon-in-possession laws remain presumptively lawful, and the three dissenting Justices echoed that view").

### C.  The Third Circuit's Decision in *Range*

In *Range*, the Third Circuit, whose precedent binds this Court absent contrary word from the Supreme Court, applied *Bruen* to Section 922(g)(1).  There, Bryan Range had been convicted in 1995 in Pennsylvania state court of lying about his income to obtain food stamps.  *Range*, 69 F.4th at 98.  That conviction, which carried a prison sentence of up to five years, barred Range for life from possessing a firearm under pain of prosecution for violating Section 922(g)(1).  But Range wanted to buy a "deer-hunting rifle and maybe a shotgun for self-defense at home," so he sued to challenge the constitutionality of that statute as applied to him.  *Id.* Range's original prayer for relief requested, *inter alia*, "[a] declaration that application of

18 U.S.C. § 922(g)(1) against [him], on account of his 1995 misdemeanor conviction . . . violates the Second Amendment to the United States Constitution." Complaint at 10, *Range v. Lombardo*, No. 20-cv-3488 (E.D. Pa. July 15, 2020) (ECF 1).

The Third Circuit, describing its opinion as "narrow," 69 F.4th at 106, proceeded through three steps to hold that Section 922(g)(1) was unconstitutional as applied just to Range. First, it adopted an expansive understanding of "the people" who possess Second Amendment rights. *Id.* at 101. Notwithstanding the repeated reassurances in the Supreme Court's caselaw about the presumptive constitutionality of felon-in-possession laws and its holding in *Barton*, the Third Circuit held that "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So [those cases'] references to 'law-abiding, responsible citizens' were dicta." *Id.* (citation omitted). Instead, "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id.* at 102 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)).

Second, the majority concluded that the activities that Range sought to take up—"to possess a rifle to hunt and a shotgun to defend himself at home—track[ed] the constitutional right as defined by *Heller*." *Id.* at 103 (citation omitted). Therefore, at least as applied to Range, Section 922(g)(1) regulated conduct that the Second Amendment protected. *Id.*

Third, having concluded that the Second Amendment covered him and his proposed conduct (hunting and self-defense in his home), the majority held that, having looked at "historical analogue[s]," *id.*, Section 922(g)(1) was unconstitutional as applied to Range because there was no "longstanding history and tradition of depriving people like Range of their firearms." *Id.* at 106. In reaching that conclusion, the court declined to credit several possible sources of a historical tradition of disarming all people with felony convictions for life, including

widespread use of the death penalty as punishment for felony convictions and Founding-era

status-based bars on gun possession by "distrusted" groups "like Loyalists, Native Americans,

Quakers, Catholics, and Blacks."  *Id.* at 105.

After the Third Circuit decided *Range*, the district court on remand entered a

"[d]eclaratory judgment . . . that 18 U.S.C. § 922(g)(1) is unconstitutional under the Second

Amendment of the United States Constitution as applied to [Range]" and enjoined enforcement

of the statue against him.  Order at 1, *Range* (E.D. Pa. Aug. 8, 2023) (ECF 30).

## III.   Applying *Bruen* and *Range*

Because of its self-described "narrow" nature, *Range* does not answer many important

questions about how to address the constitutionality of a Section 922(g)(1) indictment, especially

in the context of an as-applied challenge. 69 F.4th at 106.  Some of these are procedural—Who

has the burden of proof?  How much evidence do they need to put on?—while others are

methodological—How does a court conduct *Bruen*'s "historical tradition" analysis?—but all are

critical to resolving Defendant's Motion to Dismiss.

### A.  Burdens and Legal Standards for As-Applied Challenges

First addressed are some procedural issues.  Among the many questions *Bruen* and *Range*

did not have occasion to answer are: (1) who has the burden of proving that a Section 922(g)(1)

indictment is inconsistent with the Second Amendment; (2) how heavy that burden is; and,

(3) what evidence is relevant in determining whether that burden has been met.  A footnote in

Defendant's Motion points to Federal Rule of Criminal Procedure 12(b)(3), which provides that

a motion alleging a defect in the indictment must be made prior to trial, and that such motions

are decided by determining whether the indictment "inform[s] the defendant of the accusation

against him," and are "accompanied with such a statement of the facts and circumstances as will

inform the accused of the offense, coming under the general description, with which he is charged." *United States v. Saybolt*, 577 F.3d 195, 205 (3d Cir. 2009) (quotations omitted). Here, the Indictment meets that forgiving standard. But Jenkins ultimately brings a challenge to the constitutionality of Section 922(g)(1), which, prior to *Bruen*, was considered under a different, two-step standard as set forth in *Binderup* and its progeny. There are parts of this test that plainly are inconsistent with *Bruen*, so the Court proceeds de novo to determine the appropriate procedure.

On this question, the parties are not far apart. At an evidentiary hearing, the parties agreed that, because neither *Bruen* nor *Range* assigned the burden of production to the government until the final step in the test (identification of an analogous historical tradition of firearm regulation), the defendant in a Second Amendment case retains the burden to show that (1) he was among "the people" covered by the Second Amendment; and, (2) he was engaged in conduct covered by the Second Amendment. The parties also agreed that Jenkins need only prove these conditions by a preponderance of the evidence. In this respect, an as-applied Second Amendment challenge to an indictment tracks other constitutional inquiries. For example, when evaluating a motion to suppress in the Fourth Amendment context, "[a]n individual challenging a search has the burden of establishing that he had a reasonable expectation of privacy in the property searched and the item seized." *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (citing *Minnesota v. Olson*, 495 U.S. 91, 95-97 (1990)).

The parties disagree, however, on how the Court is to measure "Second Amendment conduct" for an as-applied challenge. This is a close and important question. Jenkins argues that, because Section 922(g)(1) disarmed him from the moment a court entered a qualifying judgment of conviction, the statute always regulates his right to bear arms, regardless of his

particular reason for carrying.  Under this view, the distinction between facial and as-applied Second Amendment challenges to the statute becomes blurry at best.  If Section 922(g)(1) regulates Second Amendment conduct with respect to all people with felony convictions at all times, then the second step in the *Range* analysis under this statute becomes a nullity, and the only question is whether there is a historical tradition of disarming people like Jenkins.  The government counters that the relevant conduct to be evaluated is what Jenkins was doing when he was found in possession of a firearm.

The government's reading hews closer to the Third Circuit's approach in *Range*.  The court did not say that "§ 922(g)(1) regulates Second Amendment conduct" by its mere operation. 69 F.4th at 103.  Instead, the statute impinged on Range's Second Amendment rights for a reason—he sought "to possess a rifle to hunt and a shotgun to defend himself at home."  *Id.* *Heller* plainly "'cover[ed] [Range's] conduct,'" so the burden shifted to the government to proffer a relevant historical record of firearm regulations.  *Id.* (second alteration in original) (quoting *Bruen*, 142 S. Ct. at 2126).  The Third Circuit was evaluating Section 922(g)(1)'s operation as it affected specific conduct, proffered by a plaintiff in a declaratory judgment action, which happened to be protected by the Second Amendment.  Thus, going forward, parties making as-applied challenges to Section 922(g)(1) must make the same showing.

But that is far from the end of the uncertainties.  Serious jurisprudential and evidentiary issues persist in evaluating the vast majority of Section 922(g)(1) indictments.

First, jurisprudential.  What does it mean to carry a gun *for the purpose of* self-defense? Imagine a defendant leaves home with a concealed handgun, planning to do three things: (1) pick up his dry cleaning; (2) sell illegal drugs; and, (3) get lunch on the way home.  The Second Amendment protects that defendant's right to carry a gun to have it at the ready in case he needs

to protect himself on the way to the dry cleaner. *Heller*, 554 U.S. at 584. On the other hand, as discussed further below, it just as surely would not protect his carrying the gun to safeguard his turf from a rival dealer. Does it still protect his intent to carry the gun for *later* self-defense if he does not intend to use it during the sale? At exactly what time did his carrying the gun stop being "Second Amendment conduct"? Was it when he left the dry cleaner, or maybe when his buyer was in sight? Does he get the Second Amendment's protection back when the drug deal is over and he is on his way to get lunch? At what point exactly? Does he lose it again if he buys lunch with the proceeds from the drug deal? While, for reasons explained below, this case does not require identifying the precise point at which the Second Amendment ceases to apply, *Range* does require these case-by-case inquiries.

Second, evidentiary. What information should a court consult when deciding if a defendant was engaged in Second Amendment conduct? Because the Second Amendment protects the right to carry a gun merely *in anticipation of* the possibility of self-defense, the defendant's intent must carry some weight in determining whether he was engaging in "Second Amendment conduct" when he possessed the gun. (What else would it mean to determine whether he was carrying the gun in anticipation of a possible need?) Should a court try to assess his subjective intent? Or can it look for objective manifestations of his intent—maybe a prior conversation with a friend, or eyewitness testimony? Why not both? At the evidentiary hearing, the government agreed that evidence of both Defendant's subjective intent and objective indicia that he was engaging in conduct protected by the Second Amendment could be relevant to this inquiry, but that is not self-evident from *Bruen* or *Range*.

In sum, where a Section 922(g)(1) defendant cannot prove by a preponderance of the evidence that he was carrying a firearm for the purpose of self-defense—or other conduct

expressly covered by the Second Amendment, such as hunting—the right to bear arms does not protect the defendant, and the indictment survives an as-applied challenge.  Section 922(g)(1) is idiosyncratic in that it is susceptible to an argument that it is unconstitutional either for the broader reason that its lifetime disarmament is inconsistent with our nation's historical tradition of firearm regulation or because there is something about the particular defendant that warrants an as-applied challenge to the statute under the Second Amendment.  Post-*Range*, addressing the latter sort of challenge requires examining the specific circumstances of a defendant's arrest.

### B.  Problems with Historical Analogical Reasoning

Another challenge that *Bruen* presents goes to the heart of a judge's role as a decision-maker and arbiter of legal disputes.  The Supreme Court and the Third Circuit direct courts to apply historically-focused analogical reasoning, but neither *Bruen* nor *Range* provides much guidance on the degree of generality with which to conduct that analysis or how the analysis maps onto criminal proceedings like this one.

The inquiry begins with *Bruen*'s command to define the right to bear arms with reference to our nation's history.  Getting history right

> requires immersing oneself in the political and intellectual atmosphere of the time—somehow placing out of mind knowledge that we have which an earlier age did not, and putting on beliefs, attitudes, philosophies, prejudices and loyalties that are not those of our day.  It is, in short, a task sometimes better suited to the historian than the lawyer.

Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 856-57, 861 (1989).  But the Supreme Court in *Bruen* announced that Second Amendment historical analysis need not be conducted with the care and precision advocated for by Justice Scalia.  Courts can avoid donning the historian's mantle, according to *Bruen*, by engaging in "analogical reasoning . . . a commonplace task for any lawyer or judge."  142 S. Ct. at 2132.  We compare "distinctly" or

"relevantly similar" aspects of putative historical analogues to the challenged regulation and determine whether the two are "analogous enough." *Id.* at 2131-33.  And although the Court acknowledged that "[e]verything is similar in infinite ways to everything else," it reasoned that judges can separate relevant similarities and dissimilarities from irrelevant ones as long as they have "some metric enabling [them] to assess which similarities are important and which are not." *Id.* at 2132 (quotations omitted).

The Supreme Court referred to "analogical reasoning" as though it were self-explanatory. It is not.  Analogical reasoning, as Judge Posner explains, has "no definite content or integrity; it denotes an unstable class of disparate reasoning methods."  Richard A. Posner, *The Problems of Jurisprudence* 86 (1990).  In any case, analogies must be more than free-flying comparison— they "only make sense if there are reasons of principle underlying them."  Neil MacCormick, *Legal Reasoning and Legal Theory* 186 (1978).  Analogy without rule is rudderless.[3]  Or maybe what *Bruen* demands is not reasoning at all.  Perhaps it is "the application of a trained, disciplined *intuition* where the manifold of particulars is too extensive to allow our minds to work on it deductively."  Charles Fried, *The Artificial Reason of the Law or: What Lawyers Know*, 60 Tex. L. Rev. 35, 57 (1981) (emphasis added).  The command merely to "reason by historical analogy" pushes Second Amendment jurisprudence into uncharted waters without compass or sextant.

To be sure, reasoning by analogy can be useful and appropriate in legal decision-making. But it only works with reference to clear governing standards.  When engaging in legal analogical reasoning, judges can rely on principles and metrics that courts have tested, and agreed on, over time.  We know, for example, that when Congress models a statute on an

---

[3] Some go further: Ronald Dworkin argued that "analogy is a way of stating a conclusion, not a way of reaching one, and theory must do the real work."  Ronald Dworkin, *In Praise of Theory*, 29 Ariz. St. L.J. 353, 371 (1997).

existing one, courts often look to the text, structure, and history of the original law to construe the new statute's scope and operation.  *See, e.g.*, *Lawson v. FMR LLC*, 571 U.S. 429, 458 (2014); *Sekhar v. United States*, 570 U.S. 729, 734-35 (2013); *Jones v. Hendrix*, 599 U.S. 465, 513-14 & 514 n.10 (2023) (Jackson, J., dissenting).  Because interpreting statutes in light of their earlier models is a common practice, outcomes are predictable, and parties can confidently expect courts to consistently apply analogical metrics and select levels of generality.  But we lack that concrete guidance when it comes to *Bruen*'s novel demand to reason analogically about history.

 *Bruen* itself demonstrates the opacity of the Court's instructions on how to conduct this exercise.  The *Bruen* respondents illustrated a tradition with 700 years' worth of examples of firearm regulation from England, the American colonies, and the early United States.  The Court rejected them as insufficiently similar to the New York "proper cause" law for various reasons:

(1) One historical comparator law, the Statute of Northampton, was too old, and it did not envision new types of weapons, *Bruen*, 142 S. Ct. at 2139-40;

(2) King Henry VIII approved of comparator regulations on handguns for a reason different from New York's justification for its law, *id.* at 2140;

(3) The author of a 1716 treatise believed that the comparator regulation sought to prevent "Act[s] of Violence or Disturbance of the Peace," whereas the New York law seemed only to contemplate preventing acts of violence, *id.* at 2142;

(4) Another comparator regulation from colonial New Jersey prohibited a smaller subset of handguns than the New York regime did, *id.* at 2143, and prohibited carrying handguns but not long guns, whereas the New York regime prohibited carrying both, *id.* at 2144;

(5) In 1871, a state supreme court held unconstitutional a statute similar to the comparator regulation, *id.* at 2147.

In rejecting each of the above proffered analogues, the Supreme Court of course identified a dissimilarity between the historical comparator and the New York law.  But it did not explain *why* exactly any of the dissimilarities it identifies is relevant or therefore breaks the analogy,

even though *Bruen* takes pains to state that a comparator regulation may be dissimilar but still analogous.  142 S. Ct. at 2133 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.")*.*  What principle unites or explains *Bruen*'s rejections?  The Court does not say.  Nor does it tightly tether the reasons behind its rejection of one proposed analogue to the reasons underpinning another.[4]

> *Bruen* does suggest that "at least two metrics" might guide courts' search for historical analogues (although it does not indicate these are the only metrics, or even that they are necessary to the analysis).  Those metrics are "*how* and *why*" the comparator regulations burdened "a law-abiding citizen's right to armed self-defense."  142 S. Ct. at 2133 (emphasis added).  Indeed, some of the Court's justifications for rejecting proposed analogues arise from these criteria.  For instance, the Court rejected several historical comparator statutes that prohibited carrying weapons in a way that caused fear, because New York's statute did not aim to prevent the causing of fear, *id.* at 2143, 2145-46—a "*why*" metric.

> But that interpretive lifeline is not enough.  A functional standard for historical analogical reasoning must identify not just the relevant criteria, but also the proper level of generality at which to apply them.  *Cf.* Laurence H. Tribe & Michael C. Dorf, *Levels of Generality in the Definition of Rights*, 57 U. Chi. L. Rev. 1057, 1087 (1990) (critiquing the "implicit suggestion

---

[4] The Supreme Court concluded that New York's law had no antebellum historical analogue, for instance, because none of the proposed comparators "operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Bruen*, 142 S. Ct. at 2150.  Should we take from this, then, that the Court's rule is that a historical comparator would have been analogous only if, (1) it applies to citizens who (2) have never broken the law and who (3) have objective self-defense needs that (4) are ordinary, and (5) it prevents the carrying of arms (6) in public (7) with a subjective intent to use them in self-defense if necessary, (8) as measured by its "operat[ion]" (as opposed, for instance, to its text, the intent of its drafters, and so on)?  Surely that is not what the Court meant, but if not, what are we to do with this explanation?

that historical traditions come equipped with something like instruction manuals explaining how abstractly the Court should describe them").  In other words, with what granularity should a court ask *Bruen*'s "why" and "how" questions?  Take for example the historical regulations prohibiting carrying weapons in a way that caused fear in others.  We know from *Bruen* that a modern regulation could pass the test even if the motivations for its prohibition—its "why"— were not identical to those in the historical record.  But how far removed can it be?  Is the right level of generality for the analogy "the eliciting of strong emotion"?  If so, a modern regulation that aimed to prevent anger, rather than fear, might be "relevantly similar."  *Bruen*, 142 S. Ct. at 2132.  Or, is the right level of generality "*any* response by others"?  If so, a modern regulation that aimed to prevent *physical* reactions might be "relevantly similar."  *Id.*  *Bruen* offers no guidance regarding how to choose among these levels of generality (or the myriad other imaginable ones), and therefore contains no instruction regarding how to properly analogize to the historical record.

　　This is not just semantics.  It is urgent.  Analogy is "often used to disguise change as continuity."  *See* Posner, *supra*, at 92-93.  And "[m]ovements in the level of constitutional generality may be used to justify almost any outcome."  Frank H. Easterbrook, *Abstraction and Authority*, 59 U. Chi. L. Rev. 349, 358 (1992).[5]  The real concern is that, absent metrics for comparison or instruction as to the proper level of generality at which to make those

---

[5] *See also Bruen*, 142 S. Ct. at 2179-80 (Breyer, J., dissenting) (arguing that, instead of principles, the majority offers "a laundry list of reasons to discount seemingly relevant historical evidence" that "give[s] judges ample tools to pick their friends out of history's crowd"); Brannon P. Denning & Glenn Harlan Reynolds, *Retconning* Heller*: Five Takes on* New York Rifle & Pistol Association, Inc. v. Bruen, 65 Wm. & Mary L. Rev. (forthcoming 2023) (manuscript at 20), https://ssrn.com/abstract=4372216 (Because *Bruen* does not explain the proper metrics for analogical comparison, "the three phases of Second Amendment analysis post-*Bruen* are: (1) Consult text, history, tradition; (2) ? ; (3) Decision."  To avoid the morass, "courts need to articulate principles of relevant similarity" and cast them "at a level of generality that limits anachronism and permits meaningful comparison."  Joseph Blocher & Eric Ruben, *Originalism-By-Analogy and Second Amendment Adjudication*, 133 Yale L.J. (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4408228.

comparisons, the rules of the game in any Second Amendment case may become, with few guard rails, whatever the adjudicating court says they are.[6]

This Court looks to *Range* for some additional guidance, but the en banc majority compounds the difficulties of resorting to "historical analogical reasoning." For example, *Range* rejected the Federal Firearms Act of 1938 ("FFA") as too dissimilar. The FFA, a predecessor to Section 922(g), *Range*, 69 F.4th at 104, disarmed only those who had been convicted of a "crime of violence," which the law defined as: "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." 52 Stat. 1250, 1250-51 (1938). Congress broadened the felon-in-possession law in 1961, disarming those convicted of any offense punishable by at least a year imprisonment and rendering the FFA inapposite as a comparator. *Range*, 69 F.4th at 104. Perhaps this is a relevant difference. But the majority did not explain why, or why it chose that level of generality at which to ask the question.[7] Moreover, *Range* rejected a host of historical status-based restrictions that disarmed people who were deemed untrustworthy—but the majority did not explain why these dissimilarities were relevant or explain why "untrustworthiness" was not the proper level of generality. *Range*, 69 F.4th at 105 ("[A]ny such analogy would be far too

---

[6] And if the *Bruen* method spreads to other areas of constitutional jurisprudence, as the tides of the moment suggest, it will empower individual judges to enact their preferences by subtly slipping between relevance metrics and levels of generality. *Cf. Tennessee v. Lane*, 541 U.S. 509, 556 (2004) (Scalia, J., dissenting). Note this is hardly a new concern. By the mid-eighteenth century, philosophers had already figured out that, if a party makes a case using "a refined analogy or comparison; the opposite [party] is not at a loss to find an opposite analogy or comparison: and the preference given by the judge is often founded more on taste and imagination than on any solid argument." David Hume, *An Enquiry Concerning the Principles of Morals* 99 (Clarendon Press 1998).

[7] In any event, it concluded FFA was probably too recent to count, and "Range would not have been a prohibited person under that law." *Range*, 69 F.4th at 104.

17

broad[].” (quotation omitted)).

In short, like the Supreme Court in *Bruen*, *Range* summarily rejected proposed analogues without giving district courts meaningful criteria to evaluate why any dissimilarity is relevant (or not relevant) and which level of generality is to be employed in coming to a decision. What we do know for sure is that the *Bruen* test does not demand applying the *exact* historical law to the modern case. 142 S. Ct. at 2133.[8]

### C. *Range*’s Three Steps

Even though *Range* appears to have dramatically altered the job of a district court in properly evaluating a challenge to an indictment brought pursuant to Section 922(g)(1), and accordingly added some difficulty to the task, the Court must, nevertheless, draw appropriate principles and standards from *Range* to dispose of Defendant’s Motion and others like it. As previously stated, what is clear is that there are three steps to a *Range* analysis: First, determine whether the Defendant is among “the people” protected by the Second Amendment. Second, determine whether his reasons for carrying a firearm were congruent with Second Amendment protections. Third, determine whether historical tradition protects the challenged regulation or its application.

### i. Who Is Among “the People”?

*Range*’s first step is forgiving. Almost everyone[9] is among “the people” whom the Second Amendment protects. *Id.* at 101-02. This rule makes good sense. As the plurality put it

---

[8] *See also Range*, 69 F.4th at 129 (“[T]he majority opinion spurns [] instruction from *Bruen*” by “demand[ing] . . . a contemporary regulation’s ‘dead ringer’ and ‘historical twin.’”) (Krause, J., dissenting).

[9] Some courts have declined to extend Second Amendment rights to, for example, undocumented immigrants. *See United States v. Collette*, 630 F. Supp.3d 841, 848 (W.D. Tex. 2022) (citing *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011)).

in *Binderup*, "[t]hat individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical.  It is no different than saying that the Government may prevent an individual with First Amendment rights from engaging in First Amendment conduct . . . ."  836 F.3d at 344 (plurality opinion); *see also Range*, 69 F.4th at 102.  So under *Range*, the focus in the majority of matters is on the next two steps of the analysis.

### ii.       What Is Protected as "Second Amendment Conduct"?

The second step may have been "easy" in *Range*, *id.* at 103, but it is not so easy here given the distinctions between the postures of the two cases and the matters at issue.  Range sought to purchase and use firearms to exercise his core Second Amendment rights: "to possess a rifle to hunt and a shotgun to defend himself at home."  *Id.*  It should be unsurprising, then, that the en banc majority held that this request "track[ed] the constitutional right as defined by *Heller*," and therefore, "§ 922(g)(1) regulate[d] Second Amendment conduct" in that context. *Id.* (citation omitted).  Indeed, where an indictment charges a defendant with violating Section 922(g)(1) based on conduct that falls squarely within the core Second Amendment rights— "armed self-defense," *Bruen*, 142 S. Ct. at 2132, hunting, *Heller*, 554 U.S. at 599, or serving in the militia, *id.*—the statute regulates constitutionally protected conduct, and *Range*'s analysis at this step will control.

But *Range* does not offer much help when the facts do not so clearly track *Heller*.  For example, what if a defendant who purports to own a gun for self-defense, hunting, or militia service is arrested with it while doing something illegal?  Here, the exact scope of protected Second Amendment conduct is crucial.  While *Heller* and its progeny did not provide an exhaustive framework for determining the scope of lawful self-defense, they plainly contemplate limits on the conduct the Second Amendment protects, whether in the types of firearms that are

covered or their uses.[10]  In other words, a person with a qualifying conviction may find

themselves within the lawful reach of Section 922(g)(1) because they employed an otherwise-

protected firearm in a manner that the Second Amendment does not cover.  *See United States v.*

*Huet*, 665 F.3d 588, 602 (3d Cir. 2012), *abrogated on other grounds by Rehaif v. United States*,

139 S. Ct. 2191 (2019) (citing *United States v. Potter*, 630 F.3d 1260, 1261 (9th Cir. 2011) (per

curiam)) ("Otherwise illegal conduct does not somehow become immunized because possession

of a firearm is involved in the offense.").[11]

        That limitation on the *Heller* right—for what purposes one can bear protected firearms—

is central here.  Neither *Heller* nor *McDonald* expressly extended the right to bear arms beyond

lawful activities.  *See, e.g.*, *Marzzarella*, 614 F.3d at 92 (describing the *Heller* right as "the right

of law-abiding citizens to possess non-dangerous weapons for self-defense" (at that point, only in

the home) and "to possess firearms for other, as-yet-undefined, lawful purposes" (footnote call

omitted)).  Or, as Judge Easterbrook put it:

---

[10] *Heller* alternately equates the right to bear arms with the right to "be[] armed and ready for offensive or defensive action in a case of conflict with another person," 554 U.S. at 584 (quoting *Muscarello v. United States*, 542 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)), "an individual right protecting against both public and private violence," *id.* at 594, the right to "bear[] arms for a lawful purpose," *id.* at 620 (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)), and the right to carry certain weapons that "quintessential[ly]" are used for self-defense (handguns), *see id.* at 629.  Notably, the majority relied on a nineteenth-century treatise that cautioned "that the Second Amendment right ought not 'be abused to the disturbance of the public peace,' such as by assembling with other armed individuals 'for an unlawful purpose.'"  *Id.* at 607-08; *see also Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1152-53 (9th Cir. 2014), *vacated after reh'g en banc*, 824 F.3d 919 (9th Cir. 2016) (O'Scannlain, J.).  *McDonald* does not elaborate further, but simply characterizes *Heller* as announcing, "the right to keep and bear arms for the purpose of self-defense."  561 U.S. at 749-50; *see also id.* at 767-68, 780 (repeating characterizations of the right to bear arms from *Heller* based in "lawful purposes, most notably self-defense").

[11] Although not relevant to this case, the Second Amendment also may not apply where a defendant was carrying a "dangerous and unusual weapon[]," *Bruen*, 142 S. Ct. at 2143 (citing *Heller*, 554 U.S. at 627) (conceding that respondents had "show[n] that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'—a fact we already acknowledged in *Heller*").  The Second Amendment does not give anyone the right to carry *every* type of firearm.  *See Mock v. Garland*, 75 F.4th 563, 596 (5th Cir. 2023) (Higginson, J., dissenting) ("[T]he Supreme Court's more recent decision in *Bruen* left *Heller*'s dangerous-and-unusual carveout intact.").  Instead, "dangerous and unusual" weapons fall outside the scope of the Second Amendment.  *Heller*, 554 U.S. at 627.  Thus, courts have held that there is no Second Amendment right to possess a machine gun, *United States v. One (1) Palmetto State Armory PA–15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 143-44 (3d. Cir. 2016), or a pipe bomb, *United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009).  These weapons "are not typically possessed by law-abiding citizens for lawful purposes."  *Id.* at 1326.

The Court said in *Heller* that the Constitution entitles citizens to keep and bear arms for the purpose of *lawful* self-protection, not for *all* self-protection. . . .   The Constitution does not give anyone the right to be armed while committing a felony, or even to have guns in the next room for emergency use should suppliers, customers, or the police threaten a dealer's stash.   [Defendant] says that he lived in a dangerous neighborhood and wanted to protect himself from burglars and other marauders.   That may be so, but his decision to operate an illegal home business also matters.

*United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2011) (Easterbrook, C.J.).   And, in that the

Third Circuit has concluded that the Supreme Court's most recent pronouncement about the right

to bear arms did nothing to expand the types of conduct that are covered by the Second

Amendment (just where that conduct is protected), *Bruen* is no help either.   *Range*, 69 F.4th at

100, 103 (discussing "the 'where' question decided in *Bruen*," as opposed to the "who," "how,"

and "why" components of the Second Amendment analysis at issue in *Range*).[12]   Therefore,

otherwise binding authority regarding the conduct that falls within the right to bear arms—

*Heller*, *McDonald*, and Third Circuit authority interpreting those portions of those cases,[13] *see,*

*e.g.*, *Ass'n of N.J. Rifle and Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 117-18 (3d Cir.

---

[12] Indeed, even absent *Range*, the Court would conclude that the lodestar for determining what conduct the Second Amendment protects remains *Heller* and *McDonald*.   Although *Bruen* does not quote verbatim the "lawful purpose of self-defense" language found in *Heller*, 554 U.S. at 630, and *McDonald*, 561 U.S. at 767 (plurality opinion), the majority opinion used similar language that repeatedly delineated the reach of the Second Amendment's text with reference to lawful conduct only.   *See Bruen*, 142 S. Ct. at 2133 ("As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is "the *central component*" of the Second Amendment right.'" (citations omitted)).   The Court's reasoning did not require it to expand the *Heller* right.   The plaintiffs sought to "carry[] handguns publicly for self-defense."   *Id.* at 2134.   The Constitution protected that conduct because "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."   *Id.* From there, the majority simply summarized its reasoning from *Heller*. *Id.* at 2134-35.

[13] In the Third Circuit's previous en banc interpretation of the Second Amendment, *Binderup*, a clear majority of the court endorsed an understanding of the right to bear arms rooted in self-defense.   *Compare* 836 F.3d at 343 (plurality opinion) (seven out of fifteen votes) (describing the "core" Second Amendment right as, per *Heller*, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (internal quotation marks and citation omitted)), *with id.* at 367 (Hardiman, J., concurring in part and concurring in the judgment) (five out of fifteen votes) (arguing that the historical record "show[s] that there was broad consensus between Federalists and their opponents on the existence and nature of the 'natural right' to keep and bear arms for defensive purposes").

2018); *Huet*, 665 F.3d at 602—was not abrogated on this question by *Bruen* or *Range*.[14]  *Accord*

*Range*, 69 F.4th at 100-01 (concluding that "*Bruen* abrogated our Second Amendment

jurisprudence" after describing only how *Bruen* "rejected the two-step approach" in *Binderup*

and other cases and expanded the Second Amendment's protections "outside the home" (internal

quotation marks and citation omitted)).

### iii.     Is There a Historical Tradition of Disarming People Like Defendant?

*Range*'s "narrow" treatment of a civil request for declaratory and injunctive relief make it

especially difficult to apply the final step in its analysis in criminal cases.  69 F.4th at 106.  The

en banc majority did not fully articulate a test for how to dispose of an as-applied challenge to

Section 922(g)(1).  Instead, it simply said that the government had not carried its burden of

showing "that our Republic has a longstanding history and tradition of depriving people like

Range of their firearms."  *Id.*  Although the majority did not specifically state which of Range's

traits put him outside of our nation's historical tradition of firearms regulation, *i.e.*, which people

are "like Range" and which are not, the majority left some clues as to what about Range it found

dispositive, which are reviewed below.

### a)   Dangerousness

First, Range's criminal record did not show that he was violent or otherwise dangerous to

his community.  Had he been convicted of a dangerous felony, however, the Third Circuit's

---

[14] How *Bruen* conducted its historical review reinforces this conclusion.  At the final stage in its analysis, the
majority evaluated the challenged law's constitutionality with reference to lawful uses of firearms only.  *See, e.g.*,
142 S. Ct. at 2143 (noting that a 1686 law only applied to weapons with barrels "far smaller than [those] found on
the other belt and hip pistols that were commonly used for lawful purposes in the 1600s"); *id.* at 2145 (noting that
nineteenth-century public-carry restrictions did not "impair[] the right of the general population to *peacable* public
carry" (emphasis added)); *id.* at 2152 ("As for Reconstruction-era state regulations, there was little innovation over
the kinds of public-carry restrictions that had been commonplace in the early 19th century."); *id.* at 2148 (citation
omitted) (citing favorably a treatise that limited the applicability of firearm surety laws to "circumstances giving just
reason to fear that [someone] purposes to make an unlawful use of them"); *id.* at 2150 ("The historical evidence
from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation.").

application of *Bruen* may have come out differently.  While the en banc majority declined to determine if "dangerousness is the 'touchstone'" of the third step in its analysis "because the Government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not," *Range*, 69 F.4th at 104 n.9 (citation omitted), other parts of the majority opinion do seem to identify Range's non-dangerousness as pertinent to its analysis.  When the majority rejected the possibility that a felony conviction alone could render someone outside the group of "law-abiding, responsible citizens," it noted that "today, felonies include a wide swath of crimes, some of which seem minor," so "'a felon is not always more *dangerous* than a misdemeanant.'"  *Id.* at 102 (emphasis added) (quoting *Lange v. California*, 141 S. Ct. 2011, 2020 (2021)).

The majority's reference to dangerousness places it in calm Third Circuit waters.  In *Binderup*, the partial concurrence contended that "the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed."  836 F.3d at 369 (Hardiman, J., concurring in part and concurring in the judgment); *see also id.* at 357 ("The most cogent principle that can be drawn . . . is that dangerous persons likely to use firearms for illicit purposes were not understood to be protected by the Second Amendment.").  Because the appellants in *Binderup* had been convicted of "nonviolent" crimes and lacked a "demonstrated proclivity for violence," their disarmament was inconsistent with the Second Amendment under this framework.  *Id.*

To support its view, the partial concurrence in *Binderup* pointed to the proposal by members of the minority at the Pennsylvania ratifying convention to add a guarantee that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real

danger of public injury from individuals." *Id.* at 367 (quoting The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971)).  Because these and similar proposals at the ratifying conventions "were considered 'highly influential' by the Supreme Court in *Heller*," they were strong evidence that dangerousness could serve as a limit on the right to bear arms.  *Id.* at 368 (quoting *Barton*, 633 F.3d at 174).

The partial concurrence in *Binderup* tied dangerousness only loosely to actual violence. Some of the same laws that the *Range* majority deemed "far too broad[]" to support a historical tradition of disarming the appellant there, 69 F.4th at 105 (quotation omitted), were competent evidence then "that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms," *Binderup*, 835 F.3d at 367 (Hardiman, J., concurring in part and concurring in the judgment).  Although Loyalists "were neither criminals nor traitors, American legislators had determined that permitting these persons to keep and bear arms posed a potential danger."  *Id.* (quotation omitted).

In the years following *Binderup*, the precise role and definition of dangerousness was debated in cases like *Holloway v. Attorney General*, 948 F.3d 164 (3d Cir. 2020), and *Folajtar v. Attorney General*, 980 F.3d 897 (3d Cir. 2020).  In *Holloway*, a case testing the constitutionality of Section 922(g)(1) as applied to someone with a conviction for driving under the influence, the dissent submitted a narrower view that would have required evidence of "the presence of force or violence in the challenger's conduct."  948 F.3d at 185 (Fisher, J., dissenting).  Someone was not "a real danger to the public" if he merely posed a "potential for danger and risk of harm to self and others" to disarm him.  *Id.* at 183-84.  Judge Bibas canvassed similar history in his dissent in

*Folajtar*.  He argued that dangerousness could find its roots in English authority like the Militia

Act of 1662, which allowed representatives of the Crown to "seize arms from those who were

'dangerous to the Peace of the Kingdom.'"  980 F.3d at 914 (Bibas, J., dissenting) (quoting

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (Eng.)).  Distrusted groups like the Loyalists "were

potential rebels who were dangerous before they erupted into violence," so laws disarming them,

too, supported the dangerousness theory as properly focused on (at least potential) violence.  *Id.*

        To be sure, the majority in *Range* wrestled with some of these sources.  As discussed

above, the majority concluded, without further explanation, that it "would be 'far too broad[]'"

an analogy to rely on status-based restrictions applying to distrusted groups like Loyalists,

Quakers, and Black people in Range's case.  69 F.4th at 105 (quoting *Bruen*, 142 S. Ct. at 2134).

But these limited comments on the historical record's applicability to the "narrow" question of

Range's appeal do not render these laws incompetent evidence of the historical tradition of

disarming other litigants who were not "like Range."  *Range*, 69 F.4th at 106.  Instead, the court

merely noted that, in that case, "the Government d[id] not successfully analogize those groups *to

Range and his individual circumstances*."  *Id* at 105 (emphasis added).

        In sum, multiple opinions leading up to *Range* show that Founding-era governments

disarmed people convicted of violent felonies and groups they distrusted like Loyalists, Native

Americans, Quakers, and Black people because, in different ways, they thought that these groups

were dangerous.  *Range* did not dispute the strength or validity of this historical record—it just

found that record inapplicable in the case before it.  69 F.4th at 105.  Thus, if the Government

can "prove that [a] firearms regulation," including Section 922(g)(1), disarms someone because

they are dangerous in a "distinctly similar" or "relevantly similar" way to these laws, it likely

will satisfy *Bruen*'s historical test.  142 S. Ct. at 2127, 2131-32.

b) <u>Post-Conviction Conduct</u>

Second, Range's "individual circumstances," particularly "his largely law-abiding life post-conviction," undergird the majority's reasoning. *Range*, 69 F.4th at 132-33 (Krause, J., dissenting). To review, Range was convicted of lying about his income to obtain food stamps in 1995. *Id.* at 98. The majority noted that, following that conviction, Range committed no additional serious criminal offenses. *Id.* ("Other than his 1995 conviction, Range's criminal history is limited to minor traffic and parking infractions and a summary offense for fishing without a license."). And when he realized the scope of his disarmament, Range voluntarily returned a hunting rifle that he had received as a gift. *Id.* at 98-99. Finally, when it conducted the historical analysis that *Bruen* demands, the majority looked for evidence of disarming people in "Range's situation"—*i.e.*, laws disarming people even "after successfully completing his sentence and reintegrating into society." *Id.* at 105 (citation omitted). Thus, in contrast with *Binderup*, which found "no historical support for the view that the passage of time or evidence of rehabilitation can restore Second Amendment rights that were forfeited," 836 F.3d at 350; *see also Medina*, 913 F.3d at 160 ("Nor can Medina's present contributions to his community, the passage of time, or evidence of his rehabilitation un-ring the bell of his conviction."), it appears that *Range* directs the incorporation of a litigant's post-conviction conduct into its determination of whether there is a historical tradition of disarming people like him.

The majority's reliance on Range's post-conviction conduct has important doctrinal implications. Historically, Section 922(g)(1) fused a punishment of "lifetime disarmament" to a qualifying conviction. *Range*, 69 F.4th at 105; *Mai v. United States*, 952 F.3d 1106, 1121 (9th Cir. 2020). Thus, pre-*Range*, Section 922(g)(1) took effect at one point in time: the moment a court entered a qualifying judgment of conviction, that person was barred from possessing a

firearm for life, unless he had his rights restored.  *See* 18 U.S.C. § 921(a)(20).  Presumably in view of how Section 922(g)(1) had operated historically, one dissent in *Range* therefore took the majority to have determined "whether Range's disarmament was *ever* consistent with the Second Amendment."  69 F.4th at 135 (Krause, J., dissenting).  That dissent urged the Third Circuit to issue only "declaratory relief enabling him to purchase and possess firearms *in the future*."  *Id.*

But it is far from clear that, given the as-applied claim for declaratory and injunctive relief before it, the majority had occasion to reach beyond the latter (Range's right to possess a gun going forward) to decide the former (Range's right to possess a gun at any point after he was convicted).  Instead, *Range*'s reasoning changed how Section 922(g)(1)'s disarmament operates. While the law *might* disarm a person with a qualifying conviction for life—assuming that conviction otherwise survives scrutiny under *Range*—if a litigant's post-conviction conduct indicates that he is no longer part of a group of people whom there is a sufficient historical tradition of disarming, there is an independent basis for concluding that the law is no longer constitutional as applied to him, and the disarmament lifts.

Here, as in *Range*, a private party argues that the government, on a permanent and ongoing basis, is preventing him from exercising his Second Amendment rights by enforcing Section 922(g)(1) against him.  What the government would need to show at the third step in the *Range* analysis, then, is whether there is a sufficient historical tradition of disarming the litigant *as he appears before the court that day*.  In other words, even if a litigant's crime of conviction historically would have rendered him subject to disarmament immediately after judgment, the government must show that that remains the case.[15]

---

[15] It is worth noting that the Third Circuit's reworking of Section 922(g)(1)'s mechanics harmonizes it with much of the historical record reviewed in *Range*.  As the majority pointed out, at the Founding, someone convicted of certain non-capital felonies "could 'repurchase arms' after successfully completing his sentence and reintegrating into society. . . . That aptly describes Range's situation."  *Range*, 69 F.4th at 105.  Having interpreted Section 922(g)(1)

**IV.      Discussion**

Having elaborated the framework for adjudicating constitutional challenges to

indictments under Section 922(g)(1), the Court turns to Jenkins's Motion to Dismiss.  Jenkins

argues that Section 922(g)(1) is both facially unconstitutional and unconstitutional as applied to

him.  He argues in the alternative that it is unconstitutionally vague.

### A. Facial Unconstitutionality

#### i. *Vagueness*

If Section 922(g)(1) is not unconstitutional under the Second Amendment, Jenkins

argues, it is too vague to be consistent with the Due Process Clause of the Fifth Amendment.  A

criminal statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence

fair notice of what is prohibited."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  Due

process concerns attend:  If a criminal law prescribes no standards, it may "authorize[] or

encourage[] seriously discriminatory enforcement."  *Id.*  Although Jenkins brings a facial

challenge, "vagueness challenges to statutes which do not involve First Amendment freedoms

must be examined in the light of the facts of the case at hand."  *United States v. Moyer*, 674 F.3d

---

as in effect no longer automatically disarming people who have committed qualifying offenses for life, the statute
now acts the same way that these historical laws did.  *See id.* at 127-28 (Krause, J., dissenting).

In addition, many of the laws disarming groups like Catholics or Loyalists only applied to those who were unwilling
to swear a loyalty oath.  Conversely, those who took the oath were free to bear arms.  For example, in 1689, the
English Parliament barred Catholics "who refused to take an oath renouncing the tenets of their faith from owning
firearms, except as necessary for self-defense." *Id.* at 121.  But "[t]hat restriction could be lifted" if an individual
Catholic "'repeated and subscribed' to the necessary oath before 'any two or more Justices of the Peace.'" *Id.* at
122.  Colonial Virginia had a similar law that "allowed those who demonstrated their willingness to obey the law by
swearing an oath of loyalty to the King to retain their weapons." *Id.* at 124.  The record from the Revolutionary War
is similar.  Virginia adopted a loyalty oath and disarmed those "who refused to swear their 'allegiance and fidelity'
to the state." *Id.* at 125.  Pennsylvania demanded similar obeisance of its adult white male habitants in 1777. *Id.*
While laws that disarmed only those unwilling to swear an oath may not have been distinctly similar to a true
lifetime disarmament like Section 922(g)(1), they are evidence that, at the Founding, the government could make a
judgment about a group being unworthy of the right to bear arms subject to an individual demonstrating that he was
not in fact part of that group, to wit, because he had professed his fidelity to the state.  As reworked by *Range*,
Section 922(g)(1) operates similarly.

192, 211 (3d Cir. 2012) (citing *United States v. Mazurie*, 419 U.S. 544, 550 (1975)).

"The first focus of a vagueness analysis must be on the statute as it existed at the time the defendant acted and was charged with commission of a crime." *Pringle v. Ct. of Common Pleas*, 778 F.2d 998, 1002 (3d Cir. 1985) (citing *Rabe v. Washington*, 405 U.S. 313 (1972)).  Whether or not *Range* has now invalidated any part of Section 922(g)(1), Jenkins's "right to fair notice of criminally proscribed behavior and to uniform application of legal authority [wa]s implicated initially [when the violation occurred]." *Id.*  Jenkins was arrested, charged, and indicted under Section 922(g)(1) before *Range* issued.[16]  The question, then, is whether Section 922(g)(1) was vague at the time Jenkins was arrested.

It was not.  A statute is void for vagueness if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning." *Gibson v. Mayor & Council of Cty. of Wilmington*, 355 F.3d 215, 225 (3d Cir. 2004) (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).  Jenkins does not identify any particular statutory language as vague, but in any case, the plain language of Section 922(g)(1) required no guessing. It clearly defined the conduct proscribed (possession by any person convicted of a crime punishable by more than one year).  Thus, Section 922(g)(1) is not unconstitutionally vague.

### ii. *Unconstitutionality Under the Second Amendment in All Applications*

Jenkins argues that Section 922(g)(1) is facially unconstitutional under *Bruen* and *Range*. As he notes, *Range* does not address the law's facial constitutionality.  He argues that all conduct proscribed by the law is Second Amendment conduct, and that therefore the government must establish a "founding-era tradition of disarming individuals with felony convictions."  Defendant is mistaken—as explained above, although *Bruen* and *Range* require locating a historical

---

[16] Jenkins was arrested on or about November 23, 2022.  The Third Circuit decided *Range* on June 6, 2023.

analogue, they do not require finding a twin.  They do not require a traditional regime that prescribed the exact same punishment for the exact same crime as Section 922(g)(1) does.

The bar for facial unconstitutionality is high.  "A party asserting a facial challenge must establish that no set of circumstances exists under which the Act would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (en banc) (internal quotation marks omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  A statute thus is facially unconstitutional if it would be unconstitutional in "every conceivable application." *Robinson v. State of N.J.*, 806 F.2d 442, 446 (3d Cir. 1986) (internal quotation marks and citation omitted). The Supreme Court has said that facial challenges to statutes are disfavored and a court should issue "a narrower remedy" when it "will fully protect the litigants." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1994).  It is a "particularly demanding standard and is the 'most difficult challenge to mount successfully.'" *Heffner v. Murphy*, 745 F.3d 56, 65 (3d Cir. 2014) (quoting *Salerno*, 481 U.S. at 745).

Jenkins argues there is no founding-era history of disarming people convicted of felonies and that therefore Section 922(g)(1) is unconstitutional in all its applications.  But *Range* does not demand that reading.  *Range*, as explained above, is "narrow."  69 F.4th at 106.  The *Range* majority surveyed the putative historical analogues and held Section 922(g)(1) unconstitutional as applied to just one person.

In any case, facial unconstitutionality requires unconstitutionality in *all* applications.  As discussed above, neither *Bruen* nor *Range* disturbs Third Circuit precedent under which Section 922(g)(1) is constitutional *at least* as applied to dangerous offenders who have not otherwise demonstrated that they are no longer dangerous based on their post-conviction conduct. Therefore, Section 922(g)(1) is not unconstitutional in all of its applications, and Jenkins's facial

challenge fails.

### B.  Unconstitutionality as Applied to Jenkins

Jenkins's primary Second Amendment challenge to Section 922(g)(1) is as-applied.  But his reading of *Range* blurs the distinction between facial and as-applied challenges.  In the evidentiary hearing, Jenkins agreed that the second step of the *Range* analysis requires determining whether the conduct governed by the challenged law is in fact "Second Amendment conduct."  In his view, Section 922(g)(1) prohibits him from carrying a gun for any purpose whatsoever (whether one of the quintessential Second Amendment "purposes"—self-defense, hunting, or militia activity—or not), so he need not show that Section 922(g)(1) as applied to him governed any specific conduct.

Jenkins's approach is hard to square with the text of *Range* and with existing Second Amendment caselaw.  If Jenkins is arguing that mere "carriage of a gun by a person with a felony conviction" is core Second Amendment conduct, he is incorrect.  And if he is arguing something narrower—*i.e.*, that Section 922(g)(1) prohibited him from performing particular core Second Amendment activity—then he concedes that the nature of the particular conduct he sought to engage in is relevant.  The question in *Range*'s second step is not just, "Was the conduct in question legal at the time it was performed?"  (Of course it was not—that is why we are assessing the constitutionality of a Section 922(g)(1) indictment in the first place.)  The question is, "*Independent of Section 922(g)(1)*, is the conduct itself 'Second Amendment conduct'?"  The answer to that question must be more specific than "carrying a gun," because, as discussed above, it is beyond dispute that at least some purposes for carrying a gun are not Second Amendment conduct.

As explained above (*see supra* Section III.A), the parties agreed that it is Jenkins's burden to show, by a preponderance of the evidence, that his conduct was covered by the Second Amendment.[17]  During a hearing, Jenkins elicited testimony from a witness that the area in which he was arrested was a high-crime area.  Perhaps the possibility of crime makes it somewhat more likely Jenkins was carrying for the purpose of self-defense.  *But see Jackson*, 555 F.3d at 636.  Still, Jenkins did not affirmatively introduce any evidence that he sought to carry a gun for a Second Amendment purpose, so he did not demonstrate to a preponderance of the evidence that he was engaged in Second Amendment conduct.[18]  Therefore, he does not satisfy *Range*'s second step, and so there is no need to proceed to the third.  Because Jenkins has not shown that he was engaged in conduct protected by the Second Amendment, his as-applied challenge to his Indictment fails.

---

[17] The Court acknowledges with serious concern that any rule requiring a criminal defendant to establish the factual circumstances of the conduct that led to his indictment pressures that defendant's Fifth Amendment right to decline to testify.  Indeed, the Supreme Court has found it "intolerable that one constitutional right should have to be surrendered in order to assert another" and for that reason has held that prosecutors may not use a defendant's suppression-hearing testimony as evidence "on the issue of guilt" at trial.  *Simmons v. United States*, 390 U.S. 377, 394 (1968).  Still, even though "the Constitution does not . . . always forbid requiring [a criminal defendant] to choose" between two rights that it protects, it might where "compelling the election impairs to an appreciable extent any of the policies behind the rights involved," *McGautha v. California*, 402 U.S. 183, 213 (1971), *vacated on other grounds sub nom. Crampton v. Ohio*, 408 U.S. 941 (1972).  That a Section 922(g)(1) defendant may be cross-pressured in this manner makes clarification of *Range*'s evidentiary requirements all the more urgent.

[18] In the evidentiary hearing, the government offered some objective evidence that Jenkins was not engaged in Second Amendment conduct.  The government emphasized that Jenkins carried methamphetamine when he was arrested and argued, as it did in its briefing, that the circumstances of Jenkins' arrest did not suggest he was carrying the gun for the purpose of self-defense.  The Court agrees that an analysis of objective evidence of the kind the government offered is not inconsistent with *Range*, to the extent that *Range*'s "Second Amendment conduct" step requires courts to determine the purpose for which a law's challenger intended to carry.  Objective evidence may be especially helpful in the absence of any subjective testimony.  That said, that using a criminal defendant's (potentially unrelated and uncharged) conduct to decide by implication whether that defendant intended to exercise a Constitutional right raises procedural-fairness questions.  *Cf., e.g.*, *United States v. Sellers*, 512 F. App'x 319, 322, 332 (4th Cir. 2013) (noting that considering "unrelated and uncharged" conduct in the sentencing context could "turn the relevant[-]conduct analysis into an impermissible conduit for punishing uncharged and unproven conduct and would circumvent the criminal process").  Of course, courts do assess 'circumstantial suggestions' in some contexts, but relying on such suggestions to determine whether a defendant meant to exercise a right when criminal penalties may otherwise attach raises the stakes.  Again, clarification of the *Bruen*/*Range* test's evidentiary standards is required if courts must navigate these dangerous shoals.

V.      **Conclusion**

       For the foregoing reasons, Defendant's Motion to Dismiss the Indictment will be denied.

An appropriate order follows.

                **BY THE COURT:**

                */s/ Wendy Beetlestone*
                _____
                **WENDY BEETLESTONE, J.**